IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs March 18, 2009

**JERRY JEROME PRIMM v. STATE OF TENNESSEE**

**Direct Appeal from the Criminal Court for Davidson County**
**No. 2003-D-2636       J. Randall Wyatt, Jr., Judge**

_____

**No. M2008-01335-CCA-R3-PC - Filed April 16, 2009**

A Davidson County jury convicted the Petitioner, Jerry Jerome Primm, of first-degree felony murder, second-degree murder, and especially aggravated kidnapping. The trial court merged the second degree murder conviction with the felony murder conviction and ordered the Petitioner to serve a life sentence at one hundred percent as a violent offender. For his especially aggravated kidnapping conviction, the trial court sentenced the Petitioner to serve a twenty-year sentence consecutive to his life sentence. On direct appeal, this Court affirmed the Petitioner's convictions and sentences. The Petitioner then filed a post-conviction petition claiming he received the ineffective assistance of counsel at his trial. The post-conviction court denied relief, and the Petitioner now appeals claiming the post-conviction court erred when it dismissed his petition. After a thorough review of the record and applicable law, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which JERRY L. SMITH and THOMAS T. WOODALL, JJ., joined.

Dumaka Shabazz, Nashville, Tennessee, for the Appellant, Jerry Jerome Primm.

Robert E. Cooper, Jr., Attorney General and Reporter; Michael E. Moore, Solicitor General; Benjamin A. Ball, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; and Amy Eisenbeck, Assistant District Attorney General, for the Appellee, State of Tennessee.

**OPINION**

**I. Facts**

**A. Trial and Sentencing**

On direct appeal, this Court set forth the following factual summary of the evidence supporting the Petitioner's convictions:

On June 3, 2002, the [Petitioner] arranged to pick up Rodney Campbell and his cousin, Cornelius Primm. The two men were helping the [Petitioner] locate an individual who had robbed the [Petitioner] a few days earlier. The [Petitioner] picked up another individual, Brandon Lake, who claimed to know the location of the victim, Gary Moment. Apparently, the [Petitioner] believed that the victim knew the whereabouts of his robber.

With Brandon Lake's assistance, the [Petitioner] located the victim who was standing on a nearby street. The [Petitioner] then spoke to the victim from inside his vehicle and instructed the victim to get into the vehicle. The victim first refused but then reluctantly agreed, and as Brandon Lake exited the vehicle, the victim entered the car and sat in his place in the left rear passenger seat. The [Petitioner] then instructed Cornelius Primm, who was seated in the right rear passenger seat, to switch places with him so that Cornelius Primm was driving the vehicle, and the [Petitioner] was seated in the rear seat with the victim.

The [Petitioner] asked the victim where he lived, and after receiving this information, they drove to the victim's house. Once parked outside the victim's residence, the [Petitioner] displayed his gun on his lap. The [Petitioner] then hit the victim's head with his gun and exited the vehicle. Before exiting, he instructed Rodney Campbell to shoot the victim if the victim tried to leave the car. The victim then tried to reach for the gun in Mr. Campbell's lap while at the same time reaching for the car door. When the victim was out of the car, Mr. Campbell began shooting at him as he ran away. [Campbell declined to testify at the Petitioner's trial, but each party introduced portions of statements Campbell had previously given to police.] Moments later, the [Petitioner] also began shooting at the fleeing victim. Cornelius Primm estimated that the [Petitioner] fired six shots at the victim. The [Petitioner], Mr. Campbell, and Cornelius Primm then drove to the [Petitioner]'s sister's house in the [Petitioner]'s vehicle.

On June 6, 2002, the victim's sister, Lisa Moment, began searching for the victim after receiving a call from the victim's employer informing her that he had missed several days of work. She eventually discovered the victim's decomposing body in a backyard near the scene of the shooting.

Three days earlier, on June 3, 2002, a police officer had responded to a report of gun fire near the victim's residence. He investigated the general area but did not discover the victim. After Ms. Moment discovered the victim's body on June 6, the police resumed their investigation. A witness who observed the victim enter the [Petitioner]'s vehicle identified Brandon Lake as an occupant of the vehicle. The police subsequently questioned all occupants of the vehicle, including the [Petitioner], who made a sworn statement recounting his claimed involvement in the

crime. The police searched the [Petitioner]'s vehicle. Due to the decomposed state of the victim's body, they were unable to match the blood found in the vehicle to the victim's blood, but by taking a blood sample from the victim's mother, they were able to extrapolate that the blood found in the [Petitioner]'s vehicle belonged to male offspring of the victim's mother.

Police recovered a .380 caliber handgun from Mr. Campbell's residence and a .357 caliber handgun from the [Petitioner]'s girlfriend's residence. A medical examiner testified that the autopsy of the victim's body revealed that the victim died of gunshot wounds to his torso. The two bullets recovered from the victim's body were fired by Mr. Campbell's .380 caliber handgun.

*State v. Primm*, No. M2005-00301-CCA-R3-CD, 2006 WL 1816381, *1-2 (Tenn. Crim. App., at Nashville, June 29, 2006), *no Tenn. R. App. P. 11 application filed*. Based on this evidence, a Davidson County jury convicted the Petitioner of first degree felony murder, second degree murder, and especially aggravated kidnapping. Merging the Petitioner's second degree murder conviction with his first degree felony murder conviction, the trial court imposed a life sentence for the felony murder conviction and twenty years for the especially aggravated kidnapping conviction, with the sentences to be served consecutively at one hundred percent. This Court affirmed the Petitioner's convictions and sentences on direct appeal. *Id*. at *4-5.

## B. Post-Conviction

The Petitioner timely filed a petition for post-conviction relief, claiming he received the ineffective assistance of counsel at his trial. The post-conviction court held a hearing on this petition wherein the Petitioner and his trial counsel ("Counsel") testified. The Petitioner testified that Counsel failed to adequately confer with him about his trial, to retain a ballistics expert to testify at his trial, and, in general, to thoroughly investigate his case.[1]

Regarding his claim that Counsel failed to adequately confer with him about his trial, the Petitioner said that, during the two years he was jailed at the Criminal Justice Center ("CJC"), Counsel visited him only once and that the only other time the two met was during trial-related hearings. When asked to describe the substance of their conversations, the Petitioner responded that, because six years had passed, he could not recall the substance of their conversations. He did recall, however, that the conversations were short and that they did not include a discussion of their trial strategy. The Petitioner said he received letters from Counsel, but, in general, he remembered neither the number nor the substance of most of these letters.

The Petitioner claimed that at no point during his conversations with Counsel did Counsel explain the trial process to him. He testified that this ignorance caused him to reject a plea deal and

---

[1] We have omitted from these facts the testimony presented pertaining to allegations not maintained by the Petitioner on appeal.

3

to choose not to testify at his trial. He recounted that the State offered to recommend a sentence of thirty-five years in exchange for his guilty plea. Perceiving this sentence to be excessive and not understanding the risks of trial, the Petitioner rejected it and went to trial. He also claimed that he felt "uncomfortable" with the idea of testifying due to his poor understanding of the trial process and that he, therefore, chose not to testify at his trial.

The Petitioner testified that he and Counsel "didn't have good communication at all" during his three-day trial. He claimed Counsel never visited him in the evenings after trial adjourned.

The Petitioner recalled that, prior to his trial but after he had been jailed at the CJC for one year, Counsel brought him discovery material, which Counsel then reviewed with him. The Petitioner recalled that the discovery documents included a report of a ballistics analysis of the crime scene. He testified he did not believe the report explained how he could have shot the victim, because only .380 bullets were found at the scene, and his gun fired only larger bullets. The Petitioner said Counsel never obtained the services of an independent ballistics expert.

The Petitioner next said Counsel failed to retain the services of an independent investigator but conceded he never requested Counsel to investigate anything specifically. Also, although the Petitioner complained that Counsel failed to subpoena several important witnesses, the only witness the Petitioner mentioned during the post-conviction hearing was Latoya Martin, his daughter's mother, who did not witness the shooting. It is not clear from the Petitioner's testimony what Martin's testimony would have added to his defense.

On cross-examination, the Petitioner re-stated Counsel visited him only once at the CJC: when he brought the Petitioner his discovery materials. On this occasion, Counsel went through the materials, including the ballistics report, with the Petitioner and gave the Petitioner copies of the materials. The Petitioner could not recall whether during this visit Counsel reviewed with him the witnesses' statements identifying the Petitioner as the shooter. The Petitioner testified that, although he and Counsel saw each other during each of his court hearings, Counsel never discussed with him the evidence supporting the Petitioner's charges. Counsel did, however, inform the Petitioner of the State's offer of thirty-five years for his guilty plea during one of these hearings.

Counsel testified that, at the time he represented the Petitioner, he had practiced law as a criminal defense attorney for seven years, during which time he had conducted at least twenty trials, at least eight of which involved a first-degree murder charge. Regarding his communication with the Petitioner, Counsel did not recall the exact number of times he met with the Petitioner, but he insisted they met "several times" and discussed the evidence supporting the State's case. He testified he informed the Petitioner that his defense strategy was to exploit the inconsistencies in the State's evidence in order to prove the Petitioner's innocence. Counsel indicated, however, that the Petitioner did not appear to understand the strategy because it did not involve arguing the Petitioner's absolute innocence.

Counsel testified he visited the Petitioner before trial and explained to him in detail how a

4

jury trial works. He insisted that after each day of the trial he explained to the Petitioner what had happened that day, asked him whether he had any questions, and apprised him of what to expect the following day. Also, Counsel testified he explained to the Petitioner the "pros and cons" of testifying, and he and the Petitioner agreed the Petitioner was too uncomfortable and nervous to testify. He confirmed the Petitioner's account of the plea deal offered by the State, explaining that the State offered the deal after the evidence was presented at trial and before the jury verdict. Counsel testified that, after the trial, he explained to the Petitioner what would happen at the sentencing hearing as well as the scope of the Petitioner's appellate rights.

In order to prepare for the Petitioner's trial, Counsel attended Rodney Campbell's trial, which occurred several months before the Petitioner's trial, on charges stemming from the victim's murder. Counsel took notes during Campbell's trial, observing the content of the police reports and witness statements, and obtained a transcript of the trial. Having observed Campbell's trial, Counsel realized several witnesses would identify the Petitioner as one of the men that forced the victim into a vehicle. Also, Counsel learned the Petitioner's cousin would testify that, after the victim escaped from the vehicle, Campbell shot the victim and that the Petitioner then shot the victim several more times. Later, before the Petitioner's trial, Counsel interviewed the witnesses who testified at Campbell's trial. Counsel said that, at the Petitioner's trial, the State presented the same evidence it presented in Campbell's trial and followed the same strategy it followed at Campbell's trial. He recalled that, whereas he had hoped the witnesses would alter their stories from one trial to the next, the witnesses testified accurately and that he, therefore, could not impeach their testimony. Also, Counsel explained that "neither [his] investigation nor [the Petitioner's] input . . . led . . . to a solid witness that could either put [the Petitioner] somewhere else or refute any of the direct testimony that was going to be made."

Counsel testified he chose not to hire a private investigator because, believing himself capable of throughly examining the witnesses' backgrounds, he decided an investigator could add nothing to Counsel's investigation. Having observed Campbell's trial, he already knew the probable substance of each witness's testimony and, therefore, did not need to interview any witness further. Also, Counsel explained that the witnesses were relatively young and had lived in Nashville most of their adult lives. Counsel, consequently, had ready access to each witness's criminal history.

Regarding his decision to not subpoena Martin, Counsel said the Petitioner claimed that Martin would testify that the victim called the Petitioner after the shooting but before his body was found and that, therefore, the victim could not have died on the day of the shooting as the State claimed. Counsel recalled, however, that he contacted Martin and that she was unable to provide that information. Accordingly, he did not subpoena Martin.

Counsel explained that, realizing the strength of the State's case, he changed his trial strategy and planned to argue that, given the autopsy report and the witness reports of where the Petitioner stood relative to the victim, the Petitioner's having shot the victim was nearly impossible. Counsel elaborated on his strategy, saying,

5

I concentrated on explaining to the jury that the possibility that [the Petitioner] could shoot and kill [the victim] in the manner in which it was described by the witnesses and in conjunction with the autopsy report was highly unlikely, if not, impossible. And by that, I mean . . . [the Petitioner] was alleged to have been running downhill and at a ninety degree angle some fifty to seventy-five yards away, nearly the length of a football field. The victim . . . was running in the opposite direction. He had already at that point been shot by Rodney Campbell who was in the vehicle with the victim right before he escaped . . . . And after he was allegedly shot by [the Petitioner], [the victim] continued to run for somewhere in the neighborhood of a block or more and then turned and [went] behind a house and disappeared from sight and my time was spent developing a strategy to explain to the jury that it's just not possible that [the Petitioner] at that time during that confrontation could have possibly shot him that many times and . . . still [have run and disappeared] around the corner.

Counsel explained that the gun used in the shooting was never recovered but that a holster was found in the car used to abduct the victim. He testified that, although he did not specifically recall explaining this to the Petitioner, he believed he would have explained such a matter to a client. Counsel did recall reviewing with the Petitioner the photographic line-up identifications made by various witnesses to the shooting.

On cross-examination, Counsel insisted that he visited the Petitioner "several" times while he was jailed at the CJC. Also, he recalled that he received more phone calls from the Petitioner than he normally receives from jailed clients. He recounted at the Petitioner's request a third party sometimes participated in these phone conversations.

Counsel acknowledged that he did not attempt to obtain the victim's phone records in order to verify the Petitioner's claim the victim placed a call after the shooting, explaining that a record of a call is erased six months after the call and that he became aware of the victim's possible phone call far more than six months after the shooting. Counsel conceded that he never considered hiring an investigator to return to the area of the shooting and seek out additional witnesses.

Counsel recognized that he did not hire an expert to testify about the difficulty of making the shot the State alleged the Petitioner made. He explained, however, that an expert's testimony would have been of limited value because neither he nor the State could pinpoint exactly, or even approximately, where the Petitioner stood while he fired his gun. He elaborated, "[T]he variables, in other words, were so vast and so vague that I couldn't find a witness who would be able to say that that shot would be difficult or not difficult." He added that the lack of information about the Petitioner's experience with guns would also complicate any ballistics analysis. Counsel also acknowledged that he did not prepare any visual aid of the shooting to explain the difficulty of the shot to the jury.

At the conclusion of the hearing, the post-conviction court took the petition under advisement

6

and later issued a written order denying post-conviction relief. It is from this judgment that the Petitioner now appeals.

## II. Analysis

On appeal, the Petitioner contends Counsel failed to provide effective assistance, arguing that Counsel: (1) failed to adequately communicate with and inform the Petitioner of material aspects of his case; (2) failed to properly investigate the evidence supporting the State's case against the Petitioner; and (3) failed to retain the services of an independent ballistics expert to testify at his trial. The State responds that the Petitioner not only failed to establish each of his claims by clear and convincing evidence at trial but also failed to demonstrate prejudice from Counsel's conduct. The State concludes, therefore, that the post-conviction court properly dismissed his claims.

In order to obtain post-conviction relief, a petitioner must show that his or her conviction or sentence is void or voidable because of the abridgment of a constitutional right. T.C.A. § 40-30-103 (2006). The petitioner bears the burden of proving factual allegations in the petition for post-conviction relief by clear and convincing evidence. T.C.A. § 40-30-110(f) (2006). Upon review, this Court will not re-weigh or re-evaluate the evidence below; all questions concerning the credibility of witnesses, the weight and value to be given their testimony and the factual issues raised by the evidence are to be resolved by the trial judge, not the appellate courts. *Momon v. State,* 18 S.W.3d 152, 156 (Tenn.1999); *Henley v. State,* 960 S.W.2d 572, 578-79 (Tenn.1997). A post-conviction court's factual findings are subject to de novo review by this Court; however, we must accord these factual findings a presumption of correctness, which can only be overcome when a preponderance of the evidence is contrary to the post-conviction court's factual findings. *Fields v. State,* 40 S.W.3d 450, 456-57 (Tenn.2001). A post-conviction court's conclusions of law are subject to a purely de novo review by this Court, with no presumption of correctness. *Id.* at 457.

The right of a criminally accused to representation is guaranteed by both the Sixth Amendment to the United States Constitution and article I, section 9, of the Tennessee Constitution. *State v. White*, 114 S.W.3d 469, 475 (Tenn. 2003); *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999); *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975). The following two-prong test directs a court's evaluation of a claim for ineffectiveness:

> First, the [petitioner] must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the [petitioner] by the Sixth Amendment. Second, the [petitioner] must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the [petitioner] of a fair trial, a trial whose result is reliable. Unless a [petitioner] makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*Strickland v. Washington*, 466 U.S. 668, 687 (1984); *State v. Melson*, 772 S.W.2d 417, 419 (Tenn. 1989).

7

In reviewing a claim of ineffective assistance of counsel, this Court must determine whether the advice given or services rendered by the attorney are within the range of competence demanded of attorneys in criminal cases. *Baxter*, 523 S.W.2d at 936. To prevail on a claim of ineffective assistance of counsel, a petitioner must show that "counsel's representation fell below an objective standard of reasonableness." *House v. State*, 44 S.W.3d 508, 515 (Tenn. 2001) (citing *Strickland*, 466 U.S. at 688 (1984)).

When evaluating an ineffective assistance of counsel claim, the reviewing court should judge the attorney's performance within the context of the case as a whole, taking into account all relevant circumstances. *Strickland,* 466 U.S. at 690; *State v. Mitchell*, 753 S.W.2d 148, 149 (Tenn. Crim. App. 1988). The reviewing court must evaluate the questionable conduct from the attorney's perspective at the time. *Strickland,* 466 U.S. at 690; *Hellard v. State*, 629 S.W.2d 4, 9 (Tenn. 1982). In doing so, the reviewing court must be highly deferential and "should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Burns*, 6 S.W.3d at 462. Finally, we note that a defendant in a criminal case is not entitled to perfect representation, only constitutionally adequate representation. *Denton v. State*, 945 S.W.2d 793, 796 (Tenn. Crim. App. 1996). In other words, "in considering claims of ineffective assistance of counsel, 'we address not what is prudent or appropriate, but only what is constitutionally compelled.'" *Burger v. Kemp*, 483 U.S. 776, 794 (1987) (quoting *United States v. Cronic*, 466 U.S. 648, 665 n.38 (1984)). Counsel should not be deemed to have been ineffective merely because a different procedure or strategy might have produced a different result. *Williams v. State*, 599 S.W.2d 276, 279-80 (Tenn. Crim. App. 1980). The fact that a particular strategy or tactic failed or hurt the defense does not, standing alone, establish unreasonable representation. *House*, 44 S.W.3d at 515 (citing *Goad v. State*, 938 S.W.2d 363, 369 (Tenn. 1996)). However, deference to matters of strategy and tactical choices applies only if the choices are informed ones based upon adequate preparation. *House*, 44 S.W.3d at 515.

If the petitioner shows that counsel's representation fell below a reasonable standard, then the petitioner must satisfy the prejudice prong of the *Strickland* test by demonstrating "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694; *Nichols v. State*, 90 S.W.3d 576, 587 (Tenn. 2002). This reasonable probability must be "sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694; *Harris v. State*, 875 S.W.2d 662, 665 (Tenn. 1994). We will discuss each of the Petitioner's contentions in turn.

**A. Counsel's Communication with the Petitioner**

The Petitioner contends Counsel inadequately communicated with him before and during his trial and, as a consequence, failed to inform him of the material aspects of his case. The post-conviction court denied the Petitioner's claims of ineffective assistance based on Counsel's communication with the Petitioner, making several factual findings. The court found Counsel conferred with the Petitioner several times in preparation for trial; reviewed discovery materials with

8

the Petitioner; explained the State's evidence to the Petitioner; explained the jury trial process; received more than an ordinary number of phone calls from the Petitioner; attempted to explain his anticipated trial strategy to the Petitioner; regularly consulted with the Petitioner during trial; and discussed with the Petitioner whether he should testify. In our view, the record does not preponderate against the post-conviction court's findings of fact. *See Fields*, 40 S.W.3d at 456-57. The Petitioner failed to demonstrate by clear and convincing evidence his allegations that Counsel failed to inform him of material aspects of his case. *See* T.C.A. § 40-30-110(f).

We conclude, therefore, that the Petitioner failed to demonstrate that, in failing to properly communicate with the Petitioner, Counsel's services fell outside the range of competence normally required of attorneys in criminal trials. *See Baxter*, 523 S.W.2d at 936. Moreover, the Petitioner does not offer any theory as to how he was prejudiced by Counsel's conduct. *Strickland*, 466 U.S. at 694. Having failed to demonstrate either prong of the *Strickland* standard, the Petitioner fails to demonstrate that Counsel was ineffective in this regard. *Id*. He is not entitled to relief based on this issue.

## B. Counsel's Investigative Efforts

The Petitioner next contends that Counsel was ineffective because he failed to thoroughly investigate the evidence supporting the charges against the Petitioner. He particularly objects to Counsel's decision to forego retaining an independent investigator.

When the post-conviction court denied the Petitioner's claims of ineffective assistance based on this claim, it found that Counsel spoke with potential witnesses and detectives involved in the case; read police reports containing the witnesses' statements; heard Campbell's testimony at Campbell's trial; took notes at Campbell's trial; researched each witness's criminal history; and inquired into whether Martin could indeed testify to that which the Petitioner claimed. The record again does not preponderate against the post-conviction court's findings of fact. *See Fields*, 40 S.W.3d at 456-57.

We further conclude that Counsel's investigation of the Petitioner's case did not fall outside the wide range of reasonable attorney conduct in criminal trials. *See Baxter*, 523 S.W.2d at 936. Taking into account the circumstances of the Petitioner's case, we accept as reasonable Counsel's explanation for not hiring an investigator to extract the State's witnesses' statements and criminal histories. *See Mitchell*, 753 S.W.2d at 149. Counsel knew the likely content of the witnesses' testimony at the Petitioner's trial because he attended Campbell's trial. Further, Counsel through his own efforts was able to research each witness's background. In our view, therefore, Counsel's investigation into the evidence supporting the charges against the Petitioner fell within the wide range of "reasonable professional assistance." *Burns*, 6 S.W.3d at 462. Further, the Petitioner again offers no theory of how he was prejudiced by Counsel's decision to not hire an investigator. *See Strickland*, 466 U.S. at 694. As such, we conclude the Petitioner again fails to demonstrate either prong of the *Strickland* test, and, therefore, fails again to demonstrate that Counsel was ineffective. *Id*. He is not entitled to relief on this based on Counsel's investigative efforts.

## C. Ballistics Testimony

Finally, the Petitioner contends Counsel was ineffective because he failed to secure independent ballistics analysis of the scene of the shooting. He further argues that Counsel's failure to hire an independent ballistics expert to challenge the State's ballistics report caused an "actual breakdown of the adversarial process," which, under *Brimmer v. State,* disposes of his need to show prejudice. 29 S.W.3d 497, 508 (Tenn. Crim. App. 1998).

When the post-conviction court denied the Petitioner's claim of ineffective assistance based on Counsel's failure to retain an independent ballistics report, it found that the witnesses at the Petitioner's trial could not pinpoint the Petitioner's exact location and that several other variables necessary to a sound ballistics analysis remained unresolved. The evidence does not preponderate against these findings. *See Fields*, 40 S.W.3d at 456-57.

We begin our analysis of the reasonableness of Counsel's decision to forego a ballistics expert by noting that the record does not contain a copy of the State's ballistics report. Also, the Petitioner failed, at the post-conviction hearing, to proffer the testimony that he argued Counsel should have elicited, that of an independent ballistics expert. As such, the Petitioner has failed to provide this Court with an adequate record upon which to review his claim of ineffective assistance for Counsel's failure to secure an independent ballistics analysis. This defect aside, in our view, an independent ballistics analysis of the scene of the shooting would have been only minimally informative, given the lack of specific information about not only the precise location of the parties involved in the shooting but also the Petitioner's experience with guns. We are satisfied, therefore, that his decision to forego an independent ballistics analysis was reasonable, falling within the wide range of competence expected of an attorney in a criminal trial. *See Strickland*, 466 U.S. at 694; *House*, 44 S.W.3d at 515.

Finally, we address the Petitioner's claim that Counsel's conduct led to "a complete breakdown in the adversarial process" to such an extent that a showing of prejudice is unnecessary. *See Brimmer*, 29 S.W.3d at 508. As we stated above, a petitioner must generally show prejudice in order to prevail on an ineffective assistance of counsel claim. *See Strickland*, 466 U.S. at 687. A petitioner need not show prejudice, however, in a small category of cases where "counsel entirely fails to subject the prosecution's case to meaningful adversarial testing." *Wallace v. State*, 121 S.W.3d 652, 657 (Tenn. 2003) (quoting *United States v. Cronic*, 466 U.S. 648, 659 (1984)). We have already concluded that Counsel's response to the State's ballistics expert was reasonable. As such, it could not have led to a "breakdown of the adversarial process." *See Wallace*, 121 S.W.3d at 657. Indeed, Counsel's conduct places this case well outside the category of cases recognized in *Wallace* and *Cronic*, which involve extraordinarily deficient attorney conduct. *Id*. The Petitioner fails, therefore, to show Counsel's conduct was equivalent to a complete denial of counsel. *See id*. We conclude, therefore, that Counsel was not deficient in his representation of the Petitioner and that his conduct did not lead to a breakdown of the adversarial process. The Petitioner is not entitled to relief on this issue.

### III. Conclusion

After a thorough review of the record and relevant authorities, we conclude that the Petitioner fails to demonstrate he received the ineffective assistance of counsel at his trial. As such, he is not entitled to relief. Accordingly, we affirm the judgment of the post-conviction court.

_____
ROBERT W. WEDEMEYER, JUDGE